J-S22044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COREY RYAN STONEROAD | : | No. 1501 MDA 2020 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Perry County Criminal Division at
No(s):  CP-50-CR-0000112-2019

BEFORE:  PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED AUGUST 30, 2021**

The Commonwealth appeals from the order entered in the Court of Common Pleas of Perry County (trial court) granting the oral motion for extraordinary relief made by Corey Ryan Stoneroad (Stoneroad) at the sentencing hearing and vacating his jury conviction of four counts of terroristic threats.[1]  The Commonwealth contends the trial court improperly determined the verdict was against the weight of the evidence.  We reverse the trial court's order, reinstate the jury's verdict and remand for sentencing.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The jury found Stoneroad guilty of two counts of terroristic threats graded as a felony and two counts graded as a misdemeanor under 18 Pa.C.S. §§ 2706(a)(1) and (a)(3).

**I.**

**A.**

This appeal arises from a February 7, 2019 telephone call between Christine McKelvey (McKelvey), Director of the Perry County Domestic Relations Office (DRO) and Stoneroad regarding his support case concerning his emancipated child where terroristic threats were purportedly made.[2] McKelvey contacted Stoneroad after his girlfriend, Nicole Lambdin (Lambdin) made several calls to DRO seeking information about the case, which the office could not disclose to her as a third party. The primary issue was Stoneroad's

---

[2] "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another;. . . or (3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience." 18 Pa.C.S. §§ 2706(a)(1), (3). The offense is graded as a first-degree misdemeanor "unless the threat causes the occupants of the building, place of assembly or facility of public transportation to be diverted from their normal or customary operations, in which case the offense constitutes a felony of the third degree." 18 Pa.C.S. § 2706(d).

The purpose of this section is to "impose criminal liability on persons who make threats which seriously impair personal security or public convenience [and not] to penalize mere spur-of-the-moment threats which result from anger." **Id.**, Editors' Note. Neither the ability to carry out the threat nor a belief by the person threatened that it will be carried out is essential to establish the offense. **See Commonwealth v. Kline**, 201 A.3d 1288, 1290 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1038 (Pa. 2019). Rather, the harm sought to be prevented by the statute is the "psychological distress that follows from an invasion of another's sense of personal security." **Commonwealth v. Beasley**, 138 A.3d 39, 46 (Pa. Super. 2016) (citation omitted). "Terroristic threats do not have to be communicated directly." **Id.** at 47 (citation omitted).

receipt of a lump sum payment of approximately $25,000.00 from the Social Security Administration, $12,000.00 of which should have been paid to DRO for arrears. DRO attached Stoneroad's Social Security payments to collect the balance due on his child support obligation after he declined to pay it voluntarily.

Regarding that phone call, McKelvey testified that Stoneroad asked her a number of questions and was very unhappy about the child support obligation. She described Stoneroad's demeanor as "very angry and frustrated." (N.T. Jury Trial, 9/29/20, at 18). McKelvey could hear Stoneroad's voice clearly during the call and she recounted:

> When I told him there was nothing I could do about that, the money was owed, you know, we have to collect it, at first he made a — a— kind of vague threat that he was going to kill himself and — and take you out with — with me.
>
> You, I— I assumed he meant us; but I wasn't sure. And I asked him at that point, are you threatening me, or are you threatening us. And he said, no. And then he said, I should just blow my brains out and take you with me.
>
> And you, I took to mean our entire office. I wasn't — because I had no personal relationship with him. I didn't think he just meant me. So at that point, I terminated the conversation and called our Sherriff's Department.

(*Id.* at 19).

McKelvey explained that the state police came to her office to take her statement the following day and that they monitored DRO over the next few days. She stated: "I am for responsible for [my staff and] I am concerned about their safety, and they also were. So they made sure my staff got out

to their cars okay at the end of the day." (*Id.* at 20). Her office installed bulletproof doors after Stoneroad's call.

Pennsylvania State Trooper John R. Arnold, who had responded to the incident, testified that McKelvey's trial testimony was consistent with her initial interview and with her written statement. Trooper Arnold explained that when he went to Stoneroad's residence to interview him, Stoneroad denied making any threats. However, "he did state that he had said some things he shouldn't have to the Domestic Relations' Lady, is how he referred to [McKelvey]; but he refused to really elaborate as to what exactly had been said." (*Id.* at 30). To the best of Trooper Arnold's knowledge, Stoneroad did not inform police that Lambdin or Bradley Trump (Trump), a close family friend of Lambdin, had been present during the phone call.

Lambdin testified that she and Trump were with Stoneroad at the time of the phone call with McKelvey, that they were shopping for vehicle tires in Cumberland County at the time, and that they listened to the conversation over his cell phone speakerphone. Regarding the substance of the call, Lambdin indicated:

> A. Ms. McKelvey called Corey to talk to him about his case, and she started telling him that she wanted him to bring a check to the Domestic Relations Office for the amount of his arrears. And he tried to tell her that he did not have the money for the amount that she wanted the check to be. We didn't have that much. And she basically didn't want to hear that. [When] he tried to speak with her about [the situation with the emancipated child] she didn't want to hear any of that; she cut him off. And he told her

that he felt that she was taking advantage of a disabled person[3] and that he would see her in court for that. And she responded with, go ahead, the law is on my side.

After that, he said that this whole thing makes me feel like blowing my head off, but I don't want to leave my family alone. I don't know what she heard, if the phone broke up or what happened; but after he said that, she hung up on him. . . .

Q. And — and you gave me a written statement way back then?

A. Yes.

Q. . . . Did you hear him say anything about — I will use the words she said, take them out or take you out or anything like that; did you hear that?

A. Absolutely not.

(*Id.* at 41-43).

On cross-examination, Lambdin conceded that she did not speak to Trooper Arnold when he came to their residence to interview Stoneroad, nor did she inform police that she and Trump overheard the phone call. (*See id.* at 44-45).

Trump testified regarding the content of the phone call: "I heard him getting like a little agitated with somebody, and he didn't understand why they wouldn't help him. . . [Stoneroad said] that he didn't appreciate they wanted to take all his money and that he couldn't support his little ones they have now, and it made him want to take his life, but he didn't want to leave his

_____

[3] Stoneroad is wheelchair bound and is a parent to five children in addition to the emancipated child.

children all alone." (*Id.* at 52). While Trump could not remember the specific words Stoneroad used, he "never heard . . . him threaten anybody." (*Id.* at 53). Trump did not contact police to advise that he had heard the conversation, although he did provide defense counsel with a statement at the time of Stoneroad's arrest.

Stoneroad chose not to testify in his defense at trial after he consulted with counsel. The jury found him guilty of the aforementioned charges.

**B.**

At the October 23, 2020 sentencing hearing, the trial court noted that Stoneroad had maintained his innocence throughout the proceedings. The court addressed Stoneroad's reason for declining to testify at trial and pointed out its lack of colloquy in this regard:[4]

> [Stoneroad]: No. I was told not to [testify].
>
> THE COURT: Why didn't you testify? You were the only person who was the other party with that phone call.
>
> [Stoneroad]: Because I was told with my criminal record that they would rip me apart.
>
> THE COURT: What criminal record?
>
> [Stoneroad]: I have an aggravated assault because of —
>
> THE COURT: Is that a *crimen falsi*?

---

[4] As the trial court recognizes in the following excerpt, there is no express requirement that a court conduct a colloquy with regard to a defendant's right to testify. **See Commonwealth v. Todd**, 820 A.2d 707, 712 (Pa. Super. 2003), *appeal denied*, 833 A.2d 143 (Pa. 2003).

[Defense Counsel]: No. No. I analyzed that beforehand. And I believe there's a burglary charge as well.

THE COURT: [A]nd at the trial of the case, you and I had no conversation about— . . . whether you understood that you had a right to testify and you were waiving it, right? . . . Normally, when a person doesn't testify in a case like this, it's incumbent upon the judge— **not required, no violation of your constitutional rights if I don't do it**, but it's incumbent upon the judge to conduct a colloquy— . . .

[Stoneroad]: I wish I . . . would have testified now. . . .

(N.T. Sentencing Hearing, 10/23/20, at 4-6).

The trial court stated its credibility determination that McKelvey "told the absolute truth [at trial]." (*Id.* at 9). It then indicated without any prompting from the defense that the issue it was considering "is whether the evidence that was heard by the jury . . . has enough weight to justify your conviction." (*Id.*). The following exchange took place:

THE COURT: That's the issue I'm looking at now. Now, he'd have had to make a Motion for Special Relief this morning to raise that issue. . . .

[Defense Counsel]: I'm now making an oral one, Your Honor.

THE COURT: . . . [I]f the likelihood is, if there's as much likelihood that you're innocent as you are guilty, then the verdict is against the weight of the evidence. That means the most you're entitled to is another trial. Do you understand that?

[Stoneroad]: Yes, sir.

THE COURT: I can't find you not guilty.

[Stoneroad]: Okay.

THE COURT: But I can give you another trial.

- 7 -

[Stoneroad]: I appreciate it.

THE COURT: In which case, you can testify the next time.

[Stoneroad]: Yeah. I will.

THE COURT: Do you understand where we're going? Do you have any motions?

[Defense Counsel]: . . . I move that this was against the weight of the evidence and ask you to grant a new trial.

THE COURT: Your Motion for Extraordinary Relief is granted. The verdict in this case is vacated, and the District Attorney is authorized to list this matter for a new trial.

(*Id.* at 9-10).

The Commonwealth timely appealed the trial court's ruling.[5] The court and the Commonwealth complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

**II.**

The Commonwealth contends the trial court *sua sponte* raised the issue of the weight of the evidence and improperly advised defense counsel to make a motion for extraordinary relief as no unjust circumstances were present to justify the grant of extraordinary relief. The Commonwealth maintains the evidence presented at trial fully supported the verdict and the testimony of McKelvey and Trooper Arnold concerning Stoneroad's threat to DRO far outweighed that of defense witnesses Lambdin and Trump. The court

---

[5] The Commonwealth has certified that the trial court's order substantially handicaps the prosecution. *See* Pa.R.A.P. 311(d).

impermissibly reevaluated the evidence and reassessed the jury's credibility determinations.

Rule 704 permits a defendant to make an oral motion for extraordinary relief under specialized circumstances:

**(B) Oral Motion for Extraordinary Relief.**

(1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.

(2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.

Pa.R.Crim.P. 704(B)(1)-(2).

As the language of the specifies, such motions can be considered only under **extraordinary** circumstances. We have explained:

Rule 704(B) is intended to allow the trial judge the opportunity to address only those errors so manifest that immediate relief is essential. In order for Rule 704(B) to apply, however, the defendant must make an oral motion. A trial court cannot act *sua sponte* to change a verdict pursuant to Rule 704(B). Simply put, the trial judge cannot alter the verdict based upon a re-determination of credibility or a re-evaluation of the evidence.

*Commonwealth v. Wilson*, 227 A.3d 928, 937 (Pa. Super. 2020) (case citations omitted).

Absent extraordinary circumstances, a defendant may raise a challenge to the weight of the evidence with the trial judge by oral or written motion

pursuant to Rule 607 at any time before sentencing or in a post-sentence motion. *See* Pa.R.Crim.P. 607(A)(1)-(3).

With regard to the Commonwealth's procedural claims, the record is devoid of any unique circumstances warranting the grant of extraordinary relief. We agree that the trial court *sua sponte* raised the issue of the weight of the evidence by suggesting that defense counsel make such motion. While the court did not direct counsel to make the motion, it, at a minimum, encouraged him to make it and indicated that relief would be granted.

Moreover, there were no errors so manifest that immediate relief was essential or circumstances present that Stoneroad could not be protected by filing normal pre- and post-sentencing motions. McKelvey unequivocally testified that Stoneroad angrily threatened her and that she took his words to mean the entire DRO because she had no personal relationship with him. Stoneroad warned that he might "blow [his] brains out and take you with me" during a heated conversation about his substantial back child support obligation. (N.T. Trial, at 19). The trial court, despite its grant of a new trial, found McKelvey's testimony credible and specifically stated that, "she told the absolute truth." (N.T. Sentencing, at 9). The jury also considered the testimony of Lambdin and Trump that Stoneroad made no threats during the phone call and found McKelvey's testimony to the contrary more credible. None of the facts here justify grant of a Rule 704(b) motion.

Although the trial court couched its decision as a permissible exercise of its discretion because "justice seems to have gone awry," the record reflects that what it actually did was reevaluate the evidence and consider the implications of Stoneroad's decision not to testify after the jury had fulfilled its role as factfinder and resolved conflicts in the evidence in favor of the Commonwealth. (Trial Court Opinion, 2/19/21, at 1).

Additionally, the notes of testimony from the sentencing hearing and the tenor of the trial court's opinion suggest that the court was prompted to consider the weight of the evidence because Stoneroad did not testify and the court did not colloquy him. However, as previously noted, there is no express requirement that a trial court conduct a colloquy concerning a defendant's right to testify. **See Todd**, **supra** at 712 (finding meritless appellant's contention that the trial court should have conducted a colloquy to determine whether he understood his right to testify and whether he made a knowing, voluntary and intelligent waiver of this right.).[6]

In sum, we find that this case lacks any specialized circumstances warranting the grant of extraordinary relief. Additionally, the trial court raised

---

[6] The record reflects that Stoneroad was well aware of his right to testify and elected not to do so only after he consulted with counsel regarding his decision. To the extent Stoneroad maintains that counsel's advice was erroneous in this regard, any ineffective assistance of counsel claims must be deferred to collateral review. **See Commonwealth v. Rosenthal**, 233 A.3d 880, 886–87 (Pa. Super. 2020) (stating general rule that ineffectiveness claims are not cognizable on direct appeal and must be deferred to collateral review under the Post-Conviction Review Act, 42 Pa.C.S. §§ 9541-9546.).

the issue of the weight of the evidence on its own accord and impermissibly reevaluated the evidence presented at trial, in conjunction with Stoneroad's potential testimony at a new trial. Because the trial court abused its discretion in awarding Stoneroad a new trial, we reverse its October 23, 2020 order and remand for reinstatement of the original guilty verdict and for sentencing.

Order reversed. Case remanded for reinstatement of guilty verdict and sentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/30/2021